IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mary Kellogg, | ) No. CV 07-083-TUC-RCC (HCE) |
| Plaintiff, | ) **REPORT & RECOMMENDATION** |
| vs. | ) |
| Michael J. Astrue, Commissioner of Social Security, | ) |
| Defendant. | ) |

On February 20, 2007, Plaintiff filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g).  On that same date, Plaintiff's case was referred to the undersigned Magistrate Judge for a Report & Recommendation pursuant to the Rules of Practice of this Court.

Pending before the Court are Plaintiff's Motion for Summary Judgment (hereinafter "Plaintiff's MSJ") and Defendant's Cross-Motion for Summary Judgment (hereinafter "Defendant's XMSJ").  For the following reasons, the Magistrate Judge recommends that the District Court grant in part and deny in part Plaintiff's MSJ, deny Defendant's XMSJ, and remand this matter for further proceedings.

I.      PROCEDURAL HISTORY

On July 16, 2003, Plaintiff submitted to the Social Security Administration (hereinafter "SSA") applications for disability insurance benefits and supplemental security

income under Titles II and XVI, respectively, of the Social Security Act alleging inability to work since July 9, 2002 due to pain and numbness in her right arm, pain in her lower back and down both legs, melanoma of the choroid, and depression.  (TR. 107-109, 116, 494-497, 502; *see also* TR. 33, 35, 87) Plaintiff's applications were denied initially and on reconsideration. (TR. 77, 81, 83)

Plaintiff then requested a hearing before an administrative law judge (hereinafter "ALJ") and the matter was heard on March 1, 2005[1] by ALJ Frederick J. Graf who denied Plaintiff's claim.  (TR. 509-532, 87) Thereafter, the Appeals Council granted Plaintiff's request for review and remanded the matter to the ALJ for further proceedings.  (TR. 75-76) On remand, a hearing was held on May 24, 2006 wherein Plaintiff, who was represented by counsel, and Kathleen McAlpine, a vocational expert testified.  (TR. 533-564) On June 16, 2006, the ALJ entered his decision that Plaintiff was not disabled as defined in the Social Security Act. (TR. 27-40)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 25-26) On December 21, 2006, the Appeals Council, after considering additional evidence submitted by Plaintiff, denied Plaintiff's request for review thereby rendering the ALJ's June 16, 2006 decision the final decision of the Commissioner.  (TR. 9-13)  Plaintiff then initiated the instant action.

II.     THE RECORD ON APPEAL

    A.     Plaintiff's general background and Plaintiff's statements in the record

Plaintiff was born on December 21, 1960.  (TR. 107) She is divorced, has four grown children, and lives with her boyfriend and his two children.  (TR. 512-513, 543)   She completed high school and has taken some college courses.  (TR. 122, 543) Plaintiff is certified as a nursing assistant.  (TR. 122, 415) Her past relevant work has been as a waitress and a certified nursing assistant.  (TR. 122, 543)

_____

[1]Plaintiff, who was represented by counsel, was the only person to testify.

Plaintiff, who is right-handed, stopped working in 2002 due to an injury she sustained when someone accidentally swung a metal bar into her right arm "just above my elbow" at a pinata party.   (TR. 273, 515, 551) The injury caused her to lose feeling in her hand, to experience numbness and tingling in her fingers, and to drop things.  (TR. 516) Her elbow locks and she experiences neck and shoulder pain as well.  (Id.)  In 2005, Plaintiff had surgery on her right wrist.  (TR. 408) In 2006, Plaintiff underwent surgery on her right elbow.  (TR. 485, 539, 552) At the 2006 hearing she testified that she still had numbness in her right ring and pinkie fingers, was unable to pick things up, and dropped things.  (TR. 551) Her elbow was also beginning to lock again. (Id.) She planned to have another operation.  (TR. 552)

Plaintiff testified that soon after she injured her arm in 2002, she injured her low back when she "had a blow-out in the car."  (TR. 516) She experiences pain from her lower back, down her tail bone to her legs and feet.  (TR. 516-517) She also has numbness in her toes. (TR. 517) At the 2005 hearing, Plaintiff testified that she had an appointment scheduled with Dr. Curtin for a surgical consultation.  (Id.) At the 2006 hearing, Plaintiff testified that she was again scheduled to see Dr. Curtin who thought she was a good candidate for surgery. (TR. 548) Plaintiff also testified in 2006 that she had been receiving injections to her back for pain.  (TR. 539) The injections cut the pain in half and provided relief for about one month.  (TR. 547) She also goes to physical therapy.  (TR. 540)

In October 2004, Plaintiff underwent radiation treatment for a cancerous tumor in her eye.  (TR. 518) Plaintiff testified in 2005 and 2006 that she experienced headaches every day which hurt her whole head and made her feel as if a needle was being poked in her eye.  (TR. 518, 548-549) She sees flashes of light and has problems with her peripheral vision that cause her to lose her balance.  (Id.)  To get relief, she lies down in a dark room with a cool rag over her head and takes extra pain medication.  (TR. 549) If she reads for more than 15 minutes, she gets a headache as well.  (TR. 550)

- 3 -

At the 2006 hearing, Plaintiff testified that she had seen a psychiatrist for depression and bipolar disease.  (TR. 539)   Also at the 2006 hearing, Plaintiff testified that she may "possibly have a tumor in my right breast" and she has been scheduled for "another mammogram."  (TR. 539-540)

Plaintiff has three to five appointments with medical providers per week in addition to physical therapy.  (TR. 541)

At the 2006 hearing, Plaintiff testified that she can sit from 15 to 30 minutes at a time. (TR. 544) After sitting for 30 minutes, she experiences a burning pain in her legs and she has to get up and move.  (Id.) She can stand and/or walk for about 30 minutes before she feels burning pain down the back of her legs.  (TR. 544-545) She can lift up to five pounds.  (TR. 545)

Plaintiff was taking several medications including Lortab, Morphine, Cyclobenzaprine, Ranitidine, Salicylate, Ofloxacin, Wellbutrin, Xanax, Temazepam, and Lamictal.  (Id.)  Side effects included dizziness affecting her balance and problems with concentration.  (TR. 546) The medications also made her tired.  (Id.)

At the 2005 hearing Plaintiff reported a 40-pound weight gain that she attributed to medication and inactivity.  (TR. 512)   In 2006, she testified that she gained "about 50 pounds."  (TR. 544)

In 2006, Plaintiff testified that she tries to sleep through the pain and when she wakes up she "can't quite remember what I was doing so I go from one thing to the other and usually go back to bed...like confusion where my mind just isn't quite there."  (TR. 547) Two to three times a week her pain level is so high that she does not want to get out of bed. (Id.) She tires "to do laundry one day, then the next it's like okay.  It drains all of my energy that it's just–I don't even want to get out of bed...part of it my head hurts, my back hurts, and there's no reason to get up."  (Id.)

Plaintiff stated in 2004 that on a typical day, after her medication takes effect, she does her "best to accomplish at least making my bed, a few loads of laundry,

- 4 -

dishes...hobbies...but mostly I spend time watching T.V. or spacing out, I just seem to start something and get distracted because of pain and lose interest." (TR. 181) She loses her balance easily and has almost fallen in the shower. (Id.)  Although she is able to care for herself, when doing so she experiences "extreme pain which has also affected my balance". (Id.)  Dressing can be difficult and painful as well. (Id.)  She cooks but sometimes needs assistance with "putting heavy thing [sic] into [and] out of the oven, and lifting large pots... because of bending and I drop things unexpected [sic] because of numbness in right hand." (TR. 182) She does light household work with assistance lifting the laundry basket and she cannot bend to work in the yard. (Id.)  She goes to the grocery store but it takes her longer to shop because she has to walk slower and has pain upon walking. (Id.)  When shopping, she requires assistance lifting items. (Id.)  Although she drives, she is "concerned about driving, and there are days when just riding in a car causes pain because of the bumps [and] sudden stops are hard on me." (TR. 183)

> B.    Medical Evidence

>> 1.    Plaintiff's Treating Physicians

In July 2002, Plaintiff sustained an injury to her right arm when someone accidentally swung a metal bar into her right arm just above the elbow at a pinata party. (TR. 206) She presented for medical treatment with "bruising, swelling, tenderness, no distal neurovascular changes or motor changes...tingling in her hands at times, no wrist drop, also radiating pains, at times down her arm from the area of her lateral right humerus." (Id.) A right upper extremity venous duplex doppler evaluation and spectral waveform analysis was normal showing no evidence of fracture. (TR. 210; *see also* Tr. 209) X-ray of the right humerus was also normal. (TR. 209) The impression was "[c]ontusion, right arm...Radial nerve contusion, mild." (TR. 208) Plaintiff was given a modified Jones splint and pain medication. (Id.)

In August 2002, Plaintiff presented to Judith Beck, M.D., complaining of pain in her right arm resulting from the injury she sustained at the pinata party. (TR. 273) Plaintiff also

reported wrenching her right arm and shoulder when a tire blew out while she was driving.[2] (Id.)   On physical examination, Dr. Beck found back tenderness and spasms, shoulder tenderness, right elbow tenderness with normal flexion, extension, pronation and supination, mild tenderness in the right hand over the thumb and grip strength slightly lowered.  (TR. 272-273) Dr. Beck prescribed Ibuprofen and Nortriptyline.  (TR. 272)

In September 2002, Plaintiff told Dr. Beck she had "some improvement" with right arm pain but she still dropped things and felt numbness.   (TR. 267) She was also experiencing muscle burning in her shoulder.  (Id.)   On examination, Dr. Beck noted tenderness in Plaintiff's neck and right shoulder in addition to mild flank tenderness with regard to Plaintiff's back. (Id.) Plaintiff's elbow exam was normal. (Id.) Dr. Beck assessed right upper back, neck, shoulder and arm pain associated with blunt trauma and tire blow out. (TR. 266)

In September 2002, Plaintiff saw orthopaedic surgeon Lardo Sotelo, M.D., with complaints of pain in her arm with tingling and numbness over the fingers.  (TR. 223) On physical examination, Dr. Sotelo noted weakness of the extensor tendons and numbness. (Id.) Nerve conduction studies of Plaintiff's right arm were within normal limits. (TR. 222) Dr. Sotelo indicated that Plaintiff "still has something suspicious on the first web space dorsally of the right hand."  (Id.)

In October 2002, Plaintiff complained to Dr. Beck of constant elbow pain, upper arm pain and back pain.  (TR. 263) Dr. Beck's examination revealed tenderness over the lumbar paraspinous muscles, shoulder tenderness over the deltoid, and tenderness in the elbow.  (TR. 262-263) November 18, 2002 x-rays of Plaintiff's lumbar spine and right elbow were normal. (TR. 259) A December 19, 2002 x-ray of Plaintiff's right shoulder revealed "[n]o significant

---

[2]Plaintiff told Dr. Beck that the tire blow-out occurred "during this same time period" when her arm was injured at the party.  (TR. 273)

radiographic abnormalities...”  (TR. 227) December 19, 2002 x-rays of Plaintiff’s right elbow, forearm, and wrist were normal.  (Id.)

In December 2002, Dr. Beck assessed continuing pain syndrome in the right shoulder, right arm and low back.  (TR. 258) “She looks a little better, but still reports significant pain.” (Id.) Dr. Beck increased Plaintiff’s dosage of Nortriptyline, continued Salsalate, and prescribed Cyclobenzaprine because “much of her pain seems muscular.” (Id.)  Dr. Beck also recommended use of a tennis elbow band and discussed the possibility of steroid injections but Plaintiff did not “want to do that yet.” (Id.)

By February 18, 2003, Plaintiff complained to Dr. Beck about worsened back pain across the low back. (TR. 257)  On examination, Plaintiff’s right shoulder was mildly to moderately tender. (TR. 256) She had low back tenderness.  (TR. 257) Her elbow was tender and caused pain with certain types of flexion but had normal range of motion.  (TR. 256) Dr. Beck assessed chronic low back pain and prescribed Nortriptyline, Salsalate, and Flexeril. (Id.) Dr. Beck also noted that Plaintiff should consider physical therapy.  (Id.)

On April 30, 2003, Dr. Beck completed a Medical Statement wherein she indicated that Plaintiff suffered from chronic right arm pain and low back pain since 2002.  (TR.  255, 400) She stated that such conditions prevented Plaintiff from performing any substantial gainful employment and that it was unclear when Plaintiff would be able to work.  (Id.)

A July 2, 2003 lumbar CT scan denoted at L5-S1, a right-sided central disc herniation which posteriorly displaced the right S1 nerve root sleeve. (TR. 255, 492) On July 16, 2003, Dr. Beck assessed back pain noting that Plaintiff’s “CT scan findings probably explain the r[ight] lower back pain, but not the l[eft] lower back pain.  However, since it’s pushing on a nerve root, that may be causing some of her ongoing pain.” (TR. 247) Dr. Beck also assessed medial and lateral epicondylitis.  (Id.)  She continued Plaintiff on chronic pain medication and referred Plaintiff for a neurosurgical evaluation and physical therapy.  (Id.)

On August 21, 2003, neurosurgeon Abhay Sanan, M.D., evaluated Plaintiff on referral from Dr. Beck regarding complaints of low back pain with shooting pains running down both

legs.  (TR. 374-375) He noted that Plaintiff had a right-sided disc herniation at L5-S1 that is displacing the right S1 nerve root and that such condition "could explain her right leg pain, but it simply cannot explain her left leg pain or her degree of back pain."  (TR. 375) If an MRI scan "confirms the CT scan findings, then I will be less than enthusiastic about offering a surgical intervention." (Id.)  An October 7, 2003 MRI denoted: "At the L5/S1 level there is a small right paracentral disc herniation/disc protrusion with posterior displacement of the right S1 root.  There is overall mild right central stenosis." (TR. 243)

On November 7, 2003, Dr. Beck stated that Plaintiff was unable to work due to chronic right upper back pain, right lower back pain, and right arm pain.  (TR. 245) A Medical Source Statement of Ability to Do Work-Related Activities (Physical) completed by Dr. Beck[3] indicates that Plaintiff can: occasionally lift less than 10 pounds with her right arm and 10 pounds with both arms at the same time; frequently lift less than 10 pounds with both arms at the same time; and stand and/or walk for at least 2 hours in an 8-hour day.  (TR. 238) Dr. Beck based her recommendation on Plaintiff's "total picture–the severity of the right arm [and] low back pain she's had [and] the quantity of medications she's needed during the past 1½ years just to do her activities of daily living." (Id.)

Plaintiff continued to see Dr. Beck with complaints of pain through 2004.  (TR. 248-249, 354-364, 366-367) In April 2004, in addition to complaints of pain and numbness, Plaintiff also reported that she had not "been driving because she's 'spacing out.' Can last several minutes to ½ hour.  'Like daydreaming.' She gets 'foggy.'" (TR. 365) Plaintiff associated this with Neurontin.  (Id.)  It was not clear to Dr. Beck whether the Neurontin was working.  (Id.)  Dr. Beck referred Plaintiff to physical therapy (hereinafter "PT").  In May 2004, Dr. Beck noted that Plaintiff's occipital headaches may be secondary to muscle tension.  (TR. 362) Dr. Beck also decreased Plaintiff's Neurontin dosage. (Id.)  Dr. Beck indicated that Plaintiff "hasn't been able to get into PT." (Id.)  In July 2004, Dr. Beck noted

---

[3]The report is not signed.  However, the handwriting appears to be Dr. Beck's.

that Plaintiff "never got PT or pain management–she was unable to do this–her partner's father has been in the hospital 2x in the month."  (TR. 358) Also in July 2004, Plaintiff reported headaches, lapses of awareness, and insomnia in addition to increased pain.  (Id.) Plaintiff was prescribed Amitriptyline and Salsalate and referred her to neurology.  (Id.)  In August 2004, Dr. Beck noted that Plaintiff had not been to physical therapy.  (TR. 356)

In August 2004, Plaintiff was examined by neurologist David Weidman, M.D., on referral from Dr. Beck regarding Plaintiff's complaints of "an ocular headache, left worse than right, and even some visual blurring at times" which she associated with hot flashes and a "complete loss of concentration, a detached feeling, no ability to register things, and then afterwards she realized that she was basically absent...." (TR. 316-318) Dr. Weidman opined "that the concentration changes do relate to early menopause, but given the early menopause, and then the visual changes and eye pain, I would really want to make sure she does not have a pituitary tumor causing secondary ovarian failure." (TR. 318) He ordered a pituitary MRI. (Id.)

An August 26, 2004 MRI showed a "[l]entiform lesion within the superolateral aspect of the posterior right globe.  Ocular melanoma cannot be excluded." (TR. 306) Plaintiff was diagnosed with a retinal mass, of medium size, in her right eye which was confirmed as malignant melanoma of the choroid. (TR. 322, 330, 354; *see also* TR. 334-337))

On September 3, 2004, Plaintiff requested that Dr. Beck refer her to a counselor about her depression. (TR. 354) Dr. Beck noted that Plaintiff had been taking Amitriptyline. (Id.) Dr. Beck subsequently referred Plaintiff to a psychologist and to pain management. (TR. 350-351)

On October 8, 2004, Plaintiff underwent insertion of a radioactive plaque for treatment of the choroidal melanoma under the care of surgeon Reid F. Schindler, M.D. (TR. 332-333)[4]

On October 18, 2004, Kimberly Mulligan, M.D., examined Plaintiff on referral from Dr. Beck. (TR. 370-371) Upon examination, Dr. Mulligan's assessment was low back pain with right S1 radiculopathy, depression and anxiety, right upper extremity pain of unclear etiology, right ceroidal melanoma. (TR. 37)) She recommended discontinuing Elavil to be replaced by Wellbutrin for depression, Ambien or Benzodiazepine for insomnia, and referral to a spine surgeon to discuss disc herniation, low back and right lower extremity pain. (TR. 370-371) Dr. Mulligan offered to administer epidural steroid injections because Plaintiff showed "clear evidence of a right S1 radiculopathy...but I asked her to go home and think about this and let me know if she desires to proceed" because "my big concern would be that she is obviously not in the best mental state right now for further procedures, which may not lead to clinical benefit. Ms. Kellogg does understand that epidural steroid injection is not a cure for a disk herniation but is rather another way of managing her pain." (TR. 371)

Pursuant to Dr. Mulligan's recommendation, Dr. Beck prescribed Wellbutrin and Benzodiazepine and referred Plaintiff to a spine surgeon. (TR. 347) In November 2004, Plaintiff reported to Dr. Beck that there was no improvement with anxiety. (TR. 344) She also reported that the opthamologist indicated that her eye tumor was smaller. (Id.) Dr. Beck diagnosed chronic back pain and depression/anxiety. (Id.) She prescribed Prozac. (Id.) By December 20, 2004, Plaintiff's low back pain was approximately at 10[5] in the morning down

---

[4]Dr. Beck's records reflect Dr. Schindler's statement that radiation resulted in the same success rate as removal of the eye–that being a 10-year survival rate. (TR. 354) March 2005 and April 2006 thoracic and abdominal CT examinations showed that Plaintiff's cancer had not metastasized. (TR. 437, 439)

[5]Presumably, on a scale from 0 to 10 with 10 being a greater amount of pain than the lower numbers.

- 10 -

to 5 with Lotrab, Salsalate, and Flexeril.  (TR. 343)  Her right elbow was better but sometimes stuck in flexion and was difficult to straighten.  (Id.)  She had not followed up with Dr. Weidman because she thought he was upset with her because "she has applied for disability" and he was sent some papers.  (Id.)  "She says he doesn't like to get involved [with] disability application." (Id.)  Plaintiff indicated that she wanted to go to vocational rehabilitation so that she could get help with her chronic pain and return to work.  (Id.)  She also wanted to see the spine surgeon.  (Id.)  Dr. Beck noted that Dr. Weidman "found more weakness in the r[ight] arm EMG – mild r[ight] ulnar neuropathy."  (TR. 342) Dr. Beck's assessment was: "chronic back pain (bilat) [with] radicular" symptoms and decreased sensation in feet; postmenopasual bleeding; melanoma of the right eye; "situational depression–stable"; plantar fasciitis; right elbow internal derangement.  (Id.)

In late fall of 2004, Plaintiff presented at CODAC Services for counseling.  (TR. 396) In November 2004, she attended group therapy and individual psychotherapy .  (TR. 394-395) On November 12, 2004, Lori Lightman, LPC, assessed Plaintiff's Global Assessment of Functioning Score (hereinafter "GAF Score") at 50 and diagnosed depression and insomnia. (TR. 392-393; Defendant's Statement of Facts (hereafter "Defendant's SOF"), p. 4)

On December 6, 2004 Beth Newhouse, Nurse Practitioner at CODAC, completed a Psychiatric Evaluation wherein she diagnosed Major Depression Disorder.  (TR. 382) She assessed Plaintiff's GAF Score at 45.  (Id.)  She recommended Plaintiff continue on Fluoxetine, Xanax, and add Wellbutrin and Resotril.  (Id.)

In January 2005, Dr. Beck began Plaintiff on MS Contin.  (TR. 339)

On February 17, 2005, Plaintiff reported to NP Newhouse at CODAC that she was sleeping better and her depression had decreased but was still present.[6]  (TR. 376) NP Newhouse increased Plaintiff's dosage of Fluoxetine and Wellbutrin.  (Id.)

In February 2005, orthopaedist John R. Goode, M.D., evaluated Plaintiff on referral. (TR. 402-404) His findings on physical examination included

> well-preserved range of motion of the cervical spine...a negative Spurling's exam...full range of motion of the shoulder, elbow, and wrist.  Her grip is moderate.  She has a positive Phalen's test.  She has increased paresthesias in the small finger, with persistent flexion of the elbow...The ulnar nerve is not noted to subluxate from the groove, but is quite sensitive and causes paresthesias with palpation.

(TR. 403) Dr. Goode explained to Plaintiff:

> I would not call this a sure thing, but that I thought that it would be realistic to expect resolution of nocturnal paresthesias and dysesthesias with a decompression of the ulnar nerve and possibly a subcutaneous transposition, as well as a carpal tunnel release.  I do not think this will change her neck pain or back pain.  I do not think it will change the upper extremity vague pain that she has.  This was all expressed to her.  She would like to try to get a better night's sleep, and feels that getting rid of that burning in the hand would be beneficial.

(Id.)  Therefore, Dr. Goode recommended subcutaneous transposition or decompression of the ulnar nerve and decompression of the carpal tunnel.  (Id.)

In March 2005, Plaintiff underwent release of the carpal tunnel, right, and decompression of the ulnar nerve, right.  (TR. 407-408) On March 15, 2005, Plaintiff reported to Dr. Goode that the numbness and tingling of all her fingers had resolved.  (TR. 478) He directed Plaintiff to work on range of motion of the elbow and hands.  (Id.)

Also in March 2005, Plaintiff saw spine surgeon Stephen Curtin, M.D., on referral from Dr. Beck.  (TR. 405) He suspected "discogenic type back pain...Her overall treatment is somewhat complicated in that she admits to having been a relatively heavy drinker and she continues to smoke."  (Id.) He told Plaintiff she would have to quit smoking and "we would

---

[6]Defendant states that after Plaintiff's December 2004 Psychiatric Evaluation at CODAC, Plaintiff did not return to CODAC until May 10, 2005.  (Defendant's SOF, p. 4) Defendant overlooked the February 17, 2005 CODAC record.  (TR. 376)

need to evaluate the amount of alcohol she has been using" before surgery could be pursued. (TR. 406) He ordered an MRI.  (TR. 405) A May 12, 2005 MRI of the lumbar spine showed at L5-S1 redemonstration of a right paracentral disc protrusion which "appears to slightly displace the right S1 nerve." (TR. 493)  Also, at L4-5, there were mild facet hypotrophic changes seen and mild disc bulging was present.  "This does not cause any significant central or foraminal stenosis."  (Id.)

On May 10, 2005, Plaintiff returned to CODAC stating that her adoptive mother had died the week before.  (TR. 456) Plaintiff had not taken her medications for one month and wanted to begin them again because the medication controlled her anxiety and depression and helped her to sleep.  (Id.)

On May 16, 2005, Plaintiff told Dr. Beck that her hand was hurting more than before the surgery.  (TR. 417) She was still struggling with depression.  (Id.)  She also reported falling the previous Friday resulting in the "popping" of the lateral part of her right foot which was still hurting.  (Id.)

On June 30, 2005, Plaintiff complained to Dr. Beck of left ankle pain which she had experienced since twisting it two weeks previously.  (TR. 420) A July 2005 x-ray of Plaintiff's left ankle showed a minimally displaced horizontal/transverse fracture through the distal diaphysis of the left fibula.  (TR. 438) Early callus formation was "indicative of this being a subacute fracture.  'Direct blow' is likely the best mechanism of injury for the fracture."  (Id.)  Plaintiff was placed in a prewalking static boot.  (TR. 488) She was later placed in an air cast.  (TR. 423; *see also* TR. 489 (Derrick Woodbury, M.D., noting Plaintiff's complaints of fatigue and aching after being on her feet for long periods of time))

July 2005, follow up notes from Dr. Goode regarding Plaintiff's carpal tunnel and ulnar nerve surgery indicate that she had complete resolution of her numbness and tingling and was doing well. (TR. 480) On examination her grip strength was good, she had negative Phalen and elbow flexion compression test, and range of motion of the joints was symmetric

to the contralateral side.  (Id.)  Dr. Goode opined that "when the pillar pain resolves, she will be even happier."  (Id.)

On July 1, 2005, Plaintiff reported to NP Newhouse that she was "overall doing well on current meds., some return of dep[ression] this past week feeling lonely," increased stress regarding medical concerns, and poor sleep.  (TR. 457)

An August 4, 2005 follow up note from Dr. Schindler regarding Plaintiff's choroidal malignant melanoma denoted that Plaintiff's visual acuity with pinhole was 20/40 in each eye.  (TR. 409) He was "very pleased" with Plaintiff's progress and planned to re-evaluate her in four months.  (Id.)

On August 26, 2005, Michelle Thomas, P.A.-C, of Arizona Urologic Specialists, on referral from Dr. Beck, indicated her impression of chronic urinary tract infection.  (TR. 442; *see also* TR. 440)

On October 10, 2005, Dr. Beck indicated that Plaintiff suffered from a medical condition that prevented her from working and that could be expected to last for a continuous period of not less than 12 months.  (TR. 410) She cited Plaintiff's melanoma of the right eye, chronic urinary tract infections, chronic pain "which has been fairly incapacitating."  (Id.)

In October 2005, Plaintiff reported to CODAC staff that she was unhappy because she had isolated herself from people other than her boyfriend and sister.  (TR. 459)

At a December 6, 2005 follow up appointment with Dr. Goode regarding her elbow, Plaintiff complained of increased elbow pain.  (TR. 481) On physical examination her range of motion and motor strength were good.  (Id.)  "She has subjectively decreased sensation in the ulnar two digits with increasing paresthesias with persistent elbow flexion.  She is tender over the ulnar nerves in the cubital tunnel."  (Id.) He continued Plaintiff on anti-inflammatory medication.  (Id.)

On January 10, 2006, Plaintiff returned to Dr. Goode with complaints of pain.  (TR. 482) He ordered EMG studies and discussed "intrinsic versus extrinsic blood supply to the

ulnar nerve and that further surgery has a chance of making things worse just as it does making it better."  (Id.)

On January 30, 2006, Dr. Goode noted that Plaintiff presented with "continued signs and symptoms of ulnar neuritis despite ulnar nerve decompression..."  (TR. 482) Recent EMG studies showed no compression neuropathy.  (Id.)   On examination he found that Plaintiff had "subjective decreased sensation in the ulnar nerve distribution on the right, negative on the left...Her nerve tends to ride up under the medial epicondyle and is palpable though does not subluxate over it with elbow flexion.  She is exquisitely tender over the ulnar nerve."  (Id.)  Dr. Goode's diagnosis was recurrent ulnar neuritis, right.  (TR. 484)  Plaintiff opted for surgery.  (TR. 483)  "She also understands...there is a chance that she can be worse. She is willing to take that chance.  She says it is too painful to continue like this."  (Id.)   On February 6, 2006, Plaintiff underwent revision, submuscular ulnar nerve transposition, right. (TR. 485-486) By February 16, 2006, Plaintiff reported less pain.  (TR. 487)

A February 21, 2006 note from CODAC indicates that Plaintiff updated her treatment plan "with idea of feeling better overall."  (TR. 460) Plaintiff planned to investigate cancer support groups and to get out of her house more often.  (Id.)  She had been traumatized when her daughter-in-law shot her son recently.  (Id.)  Diagnosis was bipolar disorder.  (Id.)

Additionally, by March 2006, Plaintiff had undergone epidural steroid injections for back pain on three separate occasions beginning in December 2005.  (TR. 430, TR. 475-476; *see also* TR. 466-467, 472-473)  In March 2006, Plaintiff reported to Dr. Beck that she still experienced chronic low back pain and lumbar injections "helped some...helps for [approximately] one month."  (TR. 432)  Additionally, her elbow pain had decreased but she had some numbness in her fourth and fifth fingers.  (Id.)

An April 7, 2006 Physical Therapy Initial Evaluation by Christi McCain, P.T., assessed Plaintiff with "postural structural faults, muscle imbalances, decreased functional ROM and strength, increased anxiety, and restlessness, and decreased ability to perform functional ADLs."  (TR. 444)

On April 18, 2006, Plaintiff reported to NP Newhouse at CODAC that she was "overall doing well [with] current meds." and she had improved mood stability with the increase in medications.  (TR. 461) Plaintiff attributed an increase in headaches to the fact that she had just begun physical therapy for neck and back problems.  (Id.)  She was continued on her current medications.  (Id.)

On May 8, 2006, Dr. Beck completed a Medical Work Tolerance Recommendations form wherein she indicated that since July 9, 2002, Plaintiff was unable to perform in any work category including  sedentary work,[7] but could "hopefully at some point in the future." (TR. 446-447) Dr. Beck also indicated that Plaintiff should be restricted from working in extremes of heat and cold, exhaust fumes, smoke or dust, strong orders, unprotected heights, and moving machinery.  (TR. 447) She also indicated that Plaintiff should not climb ladders or stairs.  (TR. 446) "[I]n view" of  her statement that Plaintiff could not work, Dr. Beck declined to indicate the amount of time Plaintiff could stand or walk, postural limitations, limitations regarding hand and arm movements, whether Plaintiff needed to change positions frequently, and whether Plaintiff could use her feet or drive or ride in a vehicle.  (TR. 446-447) Dr. Beck stated that Plaintiff "is unable to work at all at this time due to issues of chronic pain associated depression and [illegible].  It is my hope that at some point we'll see improvement but she has a difficult situation with her health.  I believe she is highly motivated to get back to work some day."  (TR. 447)

In the summer of 2006, Plaintiff returned to Dr. Curtin, the spine surgeon.  (TR. 506, 14) Her discography "is pretty concordant with a provocative discography at 5-1 with a 9/10

-----

[7]For purposes of the form completed by Dr. Beck, "sedentary work" was defined as: "Lifting 10 pounds maximum and occasionally lifting and/or carrying such articles as dockets, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. JOBS ARE SEDENTARY IF WALKING AND STANDING ARE REQUIRED ONLY OCCASIONALLY and other sedentary criteria are met.)" (TR. 446) (emphasis in original)

pain duplication and morphologic changes..."  (TR. 15; *see also* TR. 14, 16-17) Dr. Curtin recommended a L5-S1 stabilization and fusion.  (TR. 15)

On November 14, 2006, Plaintiff underwent L5-S1 posterior lumbar interbody fusion, posterior lateral fusion.  (Plaintiff's Statement of Facts, Ex. (hereinafter "Plaintiff's Ex.")) On December 18, 2006, Plaintiff reported to Dr. Curtin that she was "feeling a lot better." (Id.)  Dr. Curtin continued Plaintiff on Percocet and she was to begin physical therapy.  (Id.)

### 2.      State-Agency Physicians

#### a.      Examining Physicians

On June 23, 2004, Kathleen V. Prouty, Ph.D., Disability Determination Specialist, conducted a psychological evaluation of Plaintiff. (TR. 282-283; Defendant's SOF, p. 2) Dr. Prouty opined that Plaintiff "developed depressive symptoms in relation to her physical complaints."  (TR. 283) She diagnosed mood disorder secondary to a general medical condition and chronic pain.  (Id.)  She indicated that Plaintiff's "[c]ognitions are intact", Plaintiff scored 30/30 on the mini-mental status examination, and Plaintiff's GAF Score was 65. (Id.)  On July 5, 2004, Dr. Prouty completed a Medical Source Statement of Ability To Do Work wherein she indicated that Plaintiff had a: "good limited, but satisfactory" ability to follow work rules; relate to co-workers, deal with the public, use judgement, interact with supervisor(s), maintain attention/concentration, and understand, remember, and carry out complex job instructions.  (TR. 284-285) Plaintiff had a "fair seriously limited, but not precluded" ability to deal with work stresses, function independently, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Id.) Plaintiff was "unlimited/very good" in her ability to understand, remember and carry out detailed but not complex job instructions, understand, remember and carry out simple job instructions,  and maintain personal appearance.  (Id.)  Dr. Prouty indicated that Plaintiff's "chronic pain" supported her assessment.  (TR. 285)

b.    Non-examining Physicians

On December 5, 2003, a doctor whose name is illegible, completed a Residual Functional Capacity Assessment form wherein he indicated that Plaintiff: could lift up to 20 pounds occasionally and up to 10 pounds frequently; could stand and or walk with normal breaks for 3-5 hours in an 8-hour work day; could sit with normal breaks for 6 hours in an 8-hour work day; was not limited in pushing or pulling; could never climb ladders, ropes or scaffolds; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; was limited to frequently reaching in all directions and handling (gross manipulation); was unlimited in fingering (fine manipulation) and feeling; should avoid concentrated exposure to hazards such as machinery and heights; and had no visual limitations. (TR. 229-236)

On May 17,  2004, A. Hirsch, M.D., completed a Residual Functional Capacity Assessment form indicating that Plaintiff could occasionally lift less than 10 pounds with her right arm and up to 10 pounds with both arms; could frequently lift less than 10 pounds; could stand and or walk with normal breaks for at least 2 hours in an 8-hour work day; could sit with normal breaks about 6 hours in an 8-hour work day; was not limited in pushing or pulling; could never climb ladders; could occasionally climb ramps, stairs, ropes, and scaffolds, crawl, and crouch; could frequently stoop, balance, and kneel; was limited to frequently reaching in all directions and handling; was unlimited in fingering and feeling; should avoid concentrated exposure to hazards such as machinery and heights; and had no visual limitations. (TR.274-281)

On July 7,  2004, psychologist Paul Tangeman, Ph.D., completed a Psychiatric Review Technique form wherein he diagnosed affective disorder, "mood D/O (disorder) due to G[eneral] M[edical] C[ondition]" and indicated that an RFC assessment was necessary. (TR. 286; Defendant's SOF, p. 3) He assessed Plaintiff's degree of limitation in her daily activities and social functioning as mild. (TR. 296) He denoted that Plaintiff was moderately limited in maintaining concentration, persistence or pace.  (Id.)  He also indicated that

- 18 -

Plaintiff had no episodes of decompensation.  (Id.)  According to Dr. Tangeman, Plaintiff was "not significantly limited" in any category of "understanding and memory."  (TR. 300) While she was "not significantly limited" in seven of the eight categories of "sustained concentration and persistence", she was "moderately limited" with regard to "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (TR. 301) Dr. Tangeman found no evidence of limitation of social interaction or adaptation.  (Id.)  Dr. Tangeman stated that Plaintiff "retains the ability to perform simple and complex work tasks [with] few stressful demands."  (TR. 302)

C.      Vocational Expert Testimony

Vocational expert Kathleen McAlpine testified at the 2006 hearing.  The ALJ asked Ms. McAlpine whether there was work Plaintiff could perform if he "were to find that the claimant could do a full range of sedentary work based upon the totality of the evidence in this record..."  (TR. 559-560) Ms. McAlpine responded that Plaintiff could work as: a receptionist of which there are 1,071,230 available jobs in the national economy and 19,400 jobs in Arizona; in a sedentary assembly position of which there are 361,000 available jobs in the national economy  and 17,416 in Arizona; and a surveillance monitor of which there are 10,666 available jobs in the national economy and 182 in Arizona.  (TR. 560-561)

Ms. McAlpine also testified that with the psychological limitations set out in Dr. Prouty's evaluation, Plaintiff would "probably be able to get the job, but she wouldn't be able to maintain it with all of them [the limitations] together."  (TR. 561-562) Therefore, the limitations identified by Dr. Prouty would prevent Plaintiff from performing any type of work.  (TR. 562) Further, if Dr. Beck's recommended limitations were applied to Plaintiff, Plaintiff would not be able to perform a full range of sedentary work.   (TR. 563) Additionally, no employer would tolerate the number of absences per month resulting from the medical and physical therapy appointments Plaintiff testified she attends on a monthly basis.  (TR. 562)

D.     Lay Testimony

The record contains statements from Plaintiff's relatives,  boyfriend, and friends describing Plaintiff's pain and other symptoms.  (*See* TR. 141-149, 170-178, 193-198)

E.     The ALJ's Findings

1.     Claim Evaluation

SSA regulations require the ALJ to evaluate disability claims pursuant to a five-step sequential process.  20 CFR §§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step requires a determination of whether the claimant is engaged in substantial gainful activity.  20 CFR §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the ALJ then proceeds to step two which requires a determination of whether the claimant has a medically severe impairment or combination of impairments. 20 CFR §§ 404.1520(c)), 416.920(c)).  In making a determination at step two, the ALJ uses medical evidence to consider whether the claimant's impairment more than minimally limited or restricted his or her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the impairment is not severe, the claim is denied.  *Id.*  If the ALJ makes a finding of severity, the ALJ proceeds to step three which requires a determination of whether the impairment meets or equals one of several listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.   20 CFR §§ 404.1520(d), 416.920(d); 20 CFR Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed impairments, then the claimant is presumed to be disabled and no further inquiry is necessary.   If a decision cannot be made based on the claimant's then current work activity or on medical facts alone because the claimant's impairment does not meet or equal a listed impairment, then evaluation proceeds to the fourth step.  At step four, ALJ considers whether the claimant has sufficient residual functional capacity

(hereinafter "RFC")[8] to perform past work.  20 CFR §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the claimant has the RFC to perform past work, then the claim is denied.  *Id*. However, if the claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience.  20 CFR §§ 404.1520(f), 416.920(f).  When determining whether the claimant retains the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA.  *Desrosiers v. Secretary,* 846 F.2d 573, 576-577 (9th Cir. 1988).   The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations.  *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply.  *Penny v. Sullivan,* 2 F.3d 953, 958-959 (9th Cir. 1993); *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply,  the ALJ must use a vocational expert in making a determination at step five.  *Desrosiers,* 846 F.2d at 580.

### 2.    The ALJ's Decision

In his May 24, 2005 decision, the ALJ found, in pertinent part, that:

3.    The claimant's back pain, right arm pain, status post right coroidal melanoma with no evidence of metastasis, and a mood disorder secondary to medical condition are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

\*\*\*

5.    [T]he claimant's allegations regarding her limitations are not totally credible....

\*\*\*

---

[8]Residual functional capacity is defined as that which an individual can still do despite his or her limitations.  20 CFR § 404.1545, 20 CFR 416§945.

6.     [T]he claimant retains the residual functional capacity to perform the exertional demands of sedentary work, or work which is generally performed while sitting and does not require lifting in excess of ten pounds.  She can stand and walk about 3-5 hours in an 8-hour workday.  She is precluded from climbing ladder/rope/scaffolds due to back pain.  She has a limited ability to reach in all directions and handle with the right upper extremity due to right arm pain.   She should avoid concentrated exposure to unprotected heights and hazardous machinery.  She was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.   She has no other mental limitations (Social Security Ruling 96-8p).  [(hereinafter "finding six" and "finding #6")]

(TR. 71-72)

The ALJ also found Plaintiff was unable to perform any of her past relevant work and that she had the residual functional capacity to perform substantially all of the full range of sedentary work.  (TR. 72) The ALJ applied the grid to determine that Plaintiff was not disabled.  (Id. (*citing* Rule 201.27, Appendix 2, Subpart P, Regulations No. 4)).

Thereafter, the Appeals Council remanded the matter to the ALJ because there was

no vocational evidence in the record regarding the extent to which the claimant's combination of exertional and nonexertional limitations erodes the occupational base for sedentary work.  These limitations include a decreased ability to reach in all directions and handle with the right upper extremity, decreased ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.

(TR. 75) The Appeals Council remanded the matter for the ALJ to "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupation base...."  (TR. 75-76)

On remand the ALJ held a hearing on May 24, 2006.  (TR. 533) At the outset of that hearing, the ALJ stated that he "inadvertently signed" the prior written decision and such decision

contained another long and lengthy dissertation, which was finding six, which went into numerous things that I did not intend to find after the first hearing.  According to my notes, I found that the client could not perform his [sic] past relevant work, but that she was able to perform a full range of sedentary work, basing that primarily upon my evaluation of all the evidence and placing substantial weight on the finding made by the Social Security Administration

in Exhibit 1B [(TR. 77-80)...I didn't find any nor ever intended to find any [sic] what the person who assisted me in preparing the written decision gratuitously put more into the decision than I had intended.

(TR. 536-537)

In his June 16, 2006 decision, the ALJ made the following findings, in pertinent part:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2007.

2.    The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b) and 416.920(b)).

3.    The claimant has the following severe impairment: right arm pain; status post carpal tunnel release and ulnar transposition surgery; status post malignant melanoma of the right choroid; and L5-S1 disc herniation with back pain (20 CFR 404.1520(c) and 416.920(c)).

      The above impairments cause significant limitation in the claimant's ability to perform basic work activities.

      Although the claimant alleges disability due to a psychological impairment, the undersigned finds that her mental health impairment is non-severe for reasons more fully outlined in the body of this decision. The claimant has the following mental limitations set fort in "Part B" of the mental listings: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace. She has had no episodes of decompensation. The evidence does not establish the presence of the "C" criteria.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

      ***

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the exertional demands of sedentary work. She is able to lift and carry 10 pounds, sit for about six hours in an 8-hour day, and stand and/or walk for two hours in an 8-hour day.

      ***

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on December 21, 1960 and was 41 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English. (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1560, 404.1566, 416.960(c) and 416.966).

        ***

11.     The claimant has not been under a "disability," as defined in the Social Security Act, from n[sic] through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on June 18, 2003 (protective filing date), the claimant is not disabled under sections 216(i) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed filed on June 18, 2003 (protective filing date), the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(TR. 32-40)

The ALJ stated that he had

reviewed the findings of the previous [*i.e.,* May 24, 2005] decision, particularly that the claimant was able to perform the full range of sedentary work activity.   However, one of the findings in the written decision, specifically finding #6, was not consistent with his instructions as it gave the claimant non-exertional limitations which he had not intended.

(TR. 33)

The ALJ further found that "*the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms*, but that the *claimant's statements*

- 24 -

*concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.*" (TR. 34) (emphasis in original)

## III.   CROSS-MOTIONS FOR SUMMARY JUDGMENT

### A.   Argument

Plaintiff argues that the ALJ erred in his determination that Plaintiff did not have non-exertional limitations.   Plaintiff also argues that the ALJ improperly rejected Dr. Beck's opinion and he improperly discredited Plaintiff's testimony.

Defendant asserts that medical records attached to Plaintiff's Statement of Facts in support of her MSJ, which were  not submitted to the ALJ or Appeals Council, do not merit remand because Plaintiff did not meet the requisite showing of good cause and materiality to allow their consideration.   Defendant also asserts that the ALJ's determination that Plaintiff had no non-exertional limitations is supported by substantial evidence.   Defendant further contends that the ALJ properly rejected Dr. Beck's opinions and provided proper rational for finding Plaintiff's subjective claims were not fully credible.

### B.   Standard of Review

An individual is entitled to Title II Social Security Disability Insurance benefits (hereinafter "SSDIB") if the individual is insured for those benefits, has not attained retainment age, has applied for those benefits, and is disabled. 42 U.S.C. § 423(a)(1).   An individual is entitled to Title XVI Supplemental Security Income disability benefits (hereinafter "SSI") if the individual is disabled and meets certain eligibility requirements. 42 U.S.C. § 1381(a).  The definition of "disability" for SSDIB and SSI purposes is the same: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   "'A claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the

national economy.'"  *Penny,* 2 F.3d at 956 (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984).  Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled.  *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

The findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error."  *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision.  *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers*, 846 F.2d at 575-76; *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)).  Substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion.  *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988).  However, substantial evidence is less than a preponderance.  *Matney,* 981 F.2d at 1019.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly.  *Id.*  However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly.  *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975).  Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion.  *Id*. at 1156.

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight.  *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on

either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion of a treating physician and that of an examining or non-examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Id.* Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Id.*

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Id.* (citations omitted). However, the Commissioner's finding that a claimant is less than credible must have some support in the record. *See Light v. Social Security Administration,* 119 F.3d 789 (9th Cir. 1997); *Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

C.     DISCUSSION

1.     New Evidence

The Court has jurisdiction to remand matters to the Commissioner for consideration of newly discovered evidence. 42 U.S.C. § 405(g). Defendant argues that the Court should not remand this matter to the Commissioner for consideration of new medical records submitted by Plaintiff in support of her MSJ. (Plaintiff's Ex.) The medical records are: (1) an August 28, 2006 treatment note from Dr. Curtin;[9] (2) November 9, 2006 notes from Plaintiff's pre-operative visit to Dr. Curtin's office; (3) the November 14, 2006 Operative Report for a L5-S1 posterior lumbar interbody fusion, posterior lateral fusion; (4) Dr. Curtin's November 15, 2006 surgery note; and (5) Dr. Curtin's December 18, 2006 treatment note.

---

[9]The administrative record contains Dr. Curtin's August 28, 2006 treatment note at TR. 14.

The Court may remand a case to the Commissioner for consideration of new evidence when the plaintiff demonstrates that there is: (1) new evidence that is material; and (2) good cause exists for her failure to incorporate that evidence into the administrative record. *Sanchez v. Secretary,* 812 F.2d 509, 511 (9th Cir. 1987) (*citing Allen v. Secretary,* 726 F.2d 1470, 1472 (9th Cir. 1984)); 42 U.S.C. § 405(g).   To satisfy the materiality requirement, Plaintiff must show "that the new evidence is material to and probative of [her] condition as it existed at the relevant time –at or before the disability hearing." *Sanchez,* 812 F.2d at 511 (*citing* 42 U.S.C. §416(i)(2)(G)).   With regard to the good cause requirement, "[i]f new information surfaces after the [Commissioner's] final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied." *Key v. Heckler,* 754 F.2d 1545, 1552 (9th Cir. 1985).   However, "[a] claimant does not meet the good cause requirement simply by obtaining a more favorable report from an expert witness once his claim is denied...The claimant must establish good cause for not seeking the expert's opinion prior to the denial of his claim." *Clem,* 894 F.2d at 332 (*citing   Key,* 754 F.2d at 1551).   However, "[t]he good cause requirement is often liberally applied, where,...there is no indication that a remand for consideration of new evidence will result in prejudice to the" Commissioner. *Bruton v. Heckler,* 724 F.2d 1415, 1417-1418 (9th Cir. 1984) (citations omitted)

Plaintiff argues that the evidence "is material given the fact that the ALJ specifically relied on the fact that her treatment up until the second hearing had been non-surgical. Consequently, the fact that she had a spinal surgery could have made a difference in his opinion...these new records reflect back on Plaintiff's condition since she stopped working in 2002."  (Plaintiff's MSJ, p. 12) Plaintiff also argues that the records "further substantiate the objective basis for Plaintiff's pain."  (Id.) (emphasis omitted)

"To meet the materiality requirement, the new evidence offered must bear directly and substantially on the matter in dispute." *Bruton,* 724 F.2d at 1417 (new evidence was material where the issue had been expressly considered by the ALJ and was "squarely before the

Appeals Council....")   Plaintiff's back condition was at issue  at the time of the hearing before the ALJ and before Appeals Council.   In fact, the ALJ included "L5-S1 disc herniation with back pain..."  in his finding of Plaintiff's severe impairments.  (TR. 32) Further, as Plaintiff persuasively points out, the ALJ discounted Plaintiff's complaints of back pain, in part, because treatment had been conservative. (TR. 36) "Consequently, the fact that she had a spinal surgery could have made a difference in his opinion." (Plaintiff's MSJ, p. 12) Thus, the evidence Plaintiff seeks to introduce meets the materiality requirement.  *See Bruton,* 724 F.2d at 1417-1418.

At the May 2006, hearing, Plaintiff testified that she had an appointment to see the spine surgeon.  (TR. 548) The record reflects that Plaintiff first saw Dr. Curtin in March 2005.  (TR. 405) He ordered an MRI and told Plaintiff she would have to quit smoking and he would need to evaluate the amount of alcohol she had been using before he would perform surgery.  (Id.)  In his June 16, 2006 opinion, the ALJ noted Plaintiff's testimony that she had "quit smoking as recommended by her physicians."  (TR. 33)

In December 2005, Plaintiff began receiving epidural steroid injections for back pain. (TR. 430, 466-467, 472-473, 475-576) Dr. Mulligan had explained that the injections were "not a cure...but rather another way of managing her pain."  (TR. 371) Plaintiff continued to receive the injections at least through March 2006.  (TR. 430, 466-467, 472-473, 475-576) They provided relief for about one month but Plaintiff still felt back pain. (TR. 432)

In April 2006, Plaintiff began physical therapy. (TR. 443-444)

In June 2006, Plaintiff returned to Dr. Curtin's office to discuss surgery.  (TR. 506) In August, after reviewing a recent discography, he recommended a L5-S1 stabilization and fusion which, according to Plaintiff's newly submitted records, he performed in November 2006.  (TR. 14-17; Plaintiff's Ex.)

This is not a case where the plaintiff sought out new evidence solely to strengthen her claim after the ALJ's denial.  "Rather than attempting to raise new issues, the evidence" herein represents the ongoing medical treatment by a physician whose recommendations had

previously appeared in the record.  *Embrey v. Bowen,* 849 F.2d 418, 424 n.5 (9th Cir. 1988).
Plaintiff herein had seen Dr. Curtin for surgical consultation before the 2006 hearing. After
her appointment, she tried less invasive treatment to no avail before returning to Dr. Curtin's
office on June 5, 2006– a few weeks before the ALJ entered his June 16, 2006  decision
denying her claim.[10]  Under the instant circumstances, "that fact that new evidence surfaced"
after the ALJ's decision in the instant case and therefore could have been presented earlier
is sufficient to satisfy the good cause requirement.  *See Bruton,* 724 F.2d at 1417-1418; *see
also Embrey,* 849 F.2d at 423-424 (good cause requirement met where new evidence could
not have been presented at the time of the administrative hearing).  Therefore, remand is
appropriate for consideration of the additional evidence submitted by Plaintiff.  *Id.*

### 2.        Non-Exertional Limitations

#### a.        Psychological Limitations

Plaintiff takes issue with the ALJ's finding that she did not suffer from
mental/psychological limitations.

At step-two, the ALJ determined that Plaintiff's "mental health impairment is non-
severe...." (TR. 33)  He found that Plaintiff had "mild restriction of activities of daily living;
mild difficulties in maintaining social functioning; mild difficulties in maintaining
concentration, persistence, or pace.  She has had no episodes of decompensation."  (Id.)

Once a claimant has demonstrated that she is not engaged in substantial gainful
activity, the ALJ must proceed to step two to determine whether the claimant has a medically
severe impairment or combination of impairments significantly limiting her from performing
basic work activities.  20 CFR §§ 404.1520(c), 416.920(c).  Under the regulations, "an
impairment or combination of impairments is not severe if it does not significantly limit your
physical or mental ability to do basic work activities."  20 CFR §§ 404.1521(a), 416.921(a).
*See also Bowen v. Yuckert,* 482 U.S. 137 (1987) (at step two, the Commissioner makes an

---

[10]At the May 2006 hearing, Plaintiff testified that she had scheduled an appointment
with Dr. Curtin.  (TR. 548)

initial determination of medical severity without consideration of the claimant's age, education, and experience); SSR 96-3p (an impairment is "not severe" when medical evidence establishes only "a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.") Basic work activities are "the abilities and aptitudes necessary to do most jobs" such as walking, standing sitting and other physical functions, understanding, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervisors, co-workers and usual work situations; and dealing with changes in a routine work setting.   20 CFR. §§ 404.1521(b), 416.921(b).

The step-two inquiry is a *de minimis* screening device to dispose of groundless claims. *Webb v. Barnhart,* 433 F.3d 683, 687 (9th Cir. 2005) (*citing* SSR 85-28); *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996).  "The regulations guiding the step-two determination of whether a disability is severe is merely a threshold determination of whether the claimant is able to perform his past work.  Thus, a finding that a claimant is severe at step two only raises a prima facie case of a disability."  *Hoopai v. Astrue,* 499 F.3d 1071, 1075 (9th Cir. 2007).

"[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'"  *Webb,* 433 F.3d at 687.; *see also Orr v. Astrue,* 2008 WL 344528 (D.Ariz. February 7, 2008) (If a finding of non-severity is not clearly established by medical evidence, adjudication must continue through the sequential evaluation process.) Thus, substantial evidence must support the ALJ's finding "that the medical evidence clearly established that [the claimant] did not have a medically severe impairment or combination of impairments." *Id.  See also Yuckert v. Bowen,* 841 F.2d 303, 306 ("Despite the deference usually accorded to the Secretary's application of regulations, numerous appellate courts have imposed a narrow construction upon the severity regulation applied here.") Additionally, to reject Dr. Prouty's uncontradicted opinion, the ALJ must provide clear and convincing reasons. *Lester*

*v. Chater,* 81 F.3d 821, 830-831 (9th Cir. 1995) ("As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician.") (*quoting Pitzer v. Sullivan,* 908 F.2d 502, 506 (9th Cir. 1990)).

> In making this determination, the ALJ gave

> substantial weight to the treatment records which document sporadic and infrequent treatment after the claimant initially sought treatment in December 2004. There are only four documented mental health visits since that date....The most recent progress note shows the claimant was doing well with increased mood stability...As such, the undersigned finds that the claimant has a non-severe psychological impairment.

(TR. 37) The ALJ gave "little weight" to examining Dr. Prouty's opinion that Plaintiff was "fairly limited in making some occupational and social adjustments," because such opinion was inconsistent with Plaintiff's mini-mental status exam results and GAF Score. (TR. 38) The ALJ also gave "little weight" to non-examining Dr. Tangeman's finding that Plaintiff "had moderate limitations...." (TR. 38)

Defendant argues that the ALJ properly rejected the examining and non-examining doctors' opinions. Defendant is correct that the ALJ may reject a doctor's opinion that varies from his own treatment notes. (Defendant's XMSJ, p. 5, *citing Saelee v. Chater,* 94 F.3d 520, 522 (9th Cir. 1996)).

Dr. Prouty's report reflects that Plaintiff received a perfect score on the mini-mental status exam. That exam "consists of eleven questions that are used to assess such *cognitive* functions as orientation, learning and memory, attention, calculations, comprehension, reading, writing, and drawing." Richard F. Spiegle, Spencer J. Crona, Legal Guidelines and Methods for Evaluating Capacity, in *Colorado Lawyer*, 32 Jun.Colo.Law. 65, 68 (June 2003) (emphasis added). The maximum possible score is 30. *Id.* Plaintiff's perfect score does not undercut Dr. Prouty's findings of "fair seriously limited..." in psychological/emotional areas such as dealing with work stresses, functioning independently, relating predictably, behaving in an emotionally stable manner, and demonstrating reliability

given Dr. Prouty's acknowledgment that "despite the ongoing depressive symptoms, [Plaintiff's] basic cognitive functioning has not been compromised." (TR. 283)

Dr. Prouty assessed a GAF Score of 65. (Id.) GAF Scores range from 1-100. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, p.32 (4th ed.) (hereinafter "*DSM-IV*"). In arriving at a GAF Score, the clinician considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness. *Id.* Physical and environmental factors are not included. *Id.* A GAF Score of 65, indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning...but generally functioning pretty well, has some meaningful interpersonal relationships. *Id.* When completing a Medical Source Statement of Ability to Do Work, Dr. Prouty found that Plaintiff was "fair seriously limited, but not precluded" with regard to making occupational adjustments (such as dealing with work stresses or functioning independently) and to making performance-social adjustments (such as behaving in an emotionally appropriate manner, relating predictably in social situations, or demonstrating reliability). Such findings are arguably inconsistent with a GAF Score indicative of only mild dysfunction. Nonetheless, the record reflects that subsequent to Dr. Prouty's evaluation, Dr. Mulligan, who evaluated Plaintiff for epidural steroid injections, noted that Plaintiff's depression and anxiety were "very important" issues and recommended a change in Plaintiff's anti-depressant medication. (TR. 370-371) Subsequent records from CODAC rate Plaintiff's GAF Score at 45 and 50 indicating "[s]erious symptoms...OR serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" and "impaired reality testing/major symptoms in several areas." *DSM-IV*, p.32; (TR. 382, 393) These GAF Scores, alone, suggest an impairment of more than a minimal nature.

Additionally, non-examining Dr. Tangeman, who was aware of Dr. Prouty's prior findings regarding GAF Score and mini-mental status exam and who noted that Plaintiff was

taking medication,[11] concluded that Plaintiff was "moderately limited" in "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (TR. 301-302) Dr. Tangeman also stated that Plaintiff was moderately limited in maintaining concentration, persistence and pace. (TR. 296) The ALJ dismissed Dr. Tangeman's opinion because he "did not have the benefit of the updated mental health records which documents her sporadic and infrequent treatment as well as her statements that she was improved with medication...." (TR. 38) However, the "updated mental health records" indicate GAF Scores of 45 and 50 and that Plaintiff's depression waxed and waned. (TR. 376-395, 448-461) Plaintiff's statements that she was feeling better do not, on this record, sufficiently contradict the earlier medical finding of moderate psychological limitations.

The "updated mental health records" also reflected that after Dr. Prouty and Dr. Tangeman entered their June 2004 and July 2004 findings respectively, Plaintiff continued on medication for depression at least through February 2005. (TR. 347, 354, 376, 382-383) In September 2004, Plaintiff requested that Dr. Beck give her a referral to a counselor for depression. (TR. 354) In October, Plaintiff contacted CODAC and scheduled an appointment for November. (TR. 396) On November 5, 2004, she attended group therapy. (TR. 395) She had an individual counseling session on November 12, 2004. (TR. 394) Plaintiff maintained contact with CODAC staff in December 2004, February, May, July, and October 2005, and February and April of 2006. (TR. 376-382, 383, 456-461) On May 10, 2005, Plaintiff reported to NP Newhouse that she had stopped taking her medication for one month and wanted to start again. (TR 456) Plaintiff persuasively argues that "it is pure speculation"

---

[11]The record reflects that Plaintiff was on anti-depressants as early as 2002. (TR. 272 (Nortriptyline, a "drug effective in the treatment of major depressive disorder," *See Physicians' Desk Reference,* 2003 WL 24113996). Dr. Prouty noted in July 2004 that Plaintiff was taking Amitriptyline. (TR. 282) Dr. Tangeman noted Plaintiff was taking Elavil. (TR. 302)

that the updated medical records would have changed the opinions of record. (Plaintiff's Reply, p.2) Instead, "if the ALJ had any doubts, he had the opportunity to send her for another consultative examination before the remand hearing or order one afterwards or even bring in a medical expert. He took none of those measures and relied simply on his own medical opinion...." (Id.) *See also Webb,* 433 F.3d at 687 (remanding where, at step two, "the ALJ had an affirmative duty to supplement [the plaintiff's] medical record to the extent it was incomplete, before rejecting [the plaintiff's] position at so early a stage in the analysis.") Nothing in the medical record herein clearly and convincingly supports the conclusion that, Plaintiff's statements, and Plaintiff's treatment history that occurred subsequent to Dr. Tangeman's or Dr. Prouty's reports would have caused the doctors to change their opinions. Moreover, the medical record that does exist regarding Plaintiff's mental health issues does not clearly show that Plaintiff's mental impairment was not severe. *See* id. The ALJ erred in his determination at step two on this issue.

Defendant argues that where "a disability claimant's mental impairments result in only mild-to-moderate limitations, the ALJ has not erred by not including such limitations in the residual functional capacity or obtaining V[ocational] E[xpert] testimony, because such limitations are not significant non-exertional limitations." (Defendant's Reply, p. 3 *citing Hoopai,* 499 F.3d 1071) *Hoopai,* involved a determination at step five, thus such limitations satisfied the *de minimis* step-two determination in that case. The Court does "not intimate that [Plaintiff] will succeed in proving that [s]he is disabled and entitled to...benefits. But...the ALJ lacked substantial evidence to find that the medical evidence clearly established [Plaintiff's] lack of a medically severe impairment...The ALJ should have continued the sequential analysis beyond step two because there was not substantial evidence to show that" Plaintiff's claim regarding her depression was groundless. *Webb,* 433 F.3d at 688. Had the ALJ determined at step two that Plaintiff's mental impairment was severe, then such impairment would have factored into the ALJ's evaluation at steps three through five. *Schoofield v. Barnhart,* 220 F.Supp.2d 512 (D. Md. 2002) ("Erroneous findings at [s]tep

[t]wo usually infect the entire decision, since all of a claimant's impairments must be considered in combination at..." steps three, four and five).  On remand, evidence may come out that will distinguish this Plaintiff's case from *Hoopai*.  At this point in the proceeding, the determination of Plaintiff's claim at the remaining steps remains in the province of the ALJ.

b.    Postural Limitations

In concluding that Plaintiff retained the ability to perform sedentary work, the ALJ gave "substantial weight" to the December 2003 opinion of the non-examining doctor, whose name is illegible.  (TR. 37 *citing* TR. 77-80, 229-236) In addition to finding that Plaintiff could perform sedentary work, the doctor also indicated that Plaintiff could: never climb ropes, ladders or scaffolds and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (TR. 231) He also found that Plaintiff could only frequently reach in all directions including overhead and handle (gross manipulation).  (TR. 232)

Plaintiff asserts that the ALJ neither adopted nor rejected these non-exertional limitations.  Plaintiff is correct that the ALJ did not provide a basis for omitting that portion of the non-examining doctor's RFC assessment.  However, Plaintiff does not refute Defendant's contention that "[e]ven if the ALJ had accepted these opined postural limitations (TR. 231), they would not have prevented Plaintiff from performing the full range of the sedentary occupational base."  (Defendant's XMSJ, p. 6-7 (*citing* SSR 85-15, 83-14)) Yet, Defendant's argument does not address the limitation to frequent[12] reaching and gross manipulation.  The authority cited by Defendant recognizes that "[m]ost sedentary jobs require good use of the hands and fingers."  SSR 83-14; *see also* SSR 85-15 (with regard to "[r]eaching, handling, fingering and feeling,...[v]arying degrees of limitations would have different effects, and the assistance of a V[ocational] S[pecialist] may be needed to determine the effects of the limitations.")

_____

[12]Frequent means from one-third to two-thirds of the time.  (*See e.g.* TR. 231)

Moreover, non-examining Dr. Hirsch also recommended the same manipulative limitations in May 2004. (TR. 277; *see also* TR. 275 (also indicating that Plaintiff could occasionally lift less than 10 pounds with her right arm and up to 10 pounds with both arms and frequently lift less than 10 pounds)) The ALJ did not mention Dr. Hirsch's recommendations. *See* 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii) ("Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.")  The ALJ did not properly support his RFC finding on this issue. *See id.*

### 3.      Plaintiff's Treating Physician's Opinions

Plaintiff argues that the ALJ erred in rejecting treating Dr. Beck's opinion.  "[T]he ALJ seems to disregard the more definitive objective evidence in favor of less definitive results." (Plaintiff's MSJ, p. 10) Dr. Beck concluded that Plaintiff was unable to work. (TR. 446-447)

Dr. Beck's opinion took into consideration Plaintiff's constellation of physical and mental impairments and resulting chronic pain.   In light of the new evidence regarding Plaintiff's back surgery and the conclusion reached herein that substantial evidence did not support the ALJ's finding regarding Plaintiff's depression at step two, Dr. Beck's opinion should be reassessed.

### 4.      Plaintiff's Credibility

Plaintiff argues that the ALJ improperly rejected her credibility.  Plaintiff's argument primarily focuses on the ALJ's discounting of Plaintiff's "back problem in part because she received minimal conservative treatment."  (Plaintiff's MSJ, p. 11) In light of the new evidence concerning Plaintiff's back surgery and the ALJ's error at step two concerning Plaintiff's depression,  Plaintiff's credibility should be reassessed.

## IV.    CONCLUSION

Plaintiff requests that the Court remand the matter for an immediate award of benefits.

Remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (citations omitted).   Where the test is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester,* 81 F.3d at 834.

As discussed above, remand is necessary for consideration of the new evidence concerning Plaintiff's back surgery, which may in turn not only affect the ALJ's RFC, and disability finding but also affect the ALJ's decision concerning Dr. Beck's opinion and Plaintiff's credibility.  *See e.g. Bruton,* 724 F.2d at 1417.   Additionally, the ALJ's error at step two requires reassessment of steps three through five.  *See Webb,* 433 F.3d 683 (remanding where ALJ erred at step two). Further, the ALJ's unexplained omission of limitations recommended by the non-examining doctors may also impact the resolution of this matter as well.  *See e.g., Bunnell v. Barnhart,* 336 F.3d 1112, 1115-1116 (9th Cir. 2003) (remanding where outstanding issues, must be resolved before a disability determination can be made). Because outstanding issues must be resolved before a determination of disability can be made, remand for an award of benefits is not warranted.  Instead, the matter should be remanded for further proceedings.

## V.    RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court:

(1)    grant in part and deny in part Plaintiff's Motion for Summary Judgment (Doc. No. 13)  The Motion should be granted to the extent that this matter should be

remanded for further proceedings.  The Motion should be denied to the extent Plaintiff seeks remand for an immediate payment of benefits;

(2)    deny Defendant's Cross-Motion for Summary Judgment (Doc. No. 14); and

(3)    remand this matter for further proceedings consistent with this Report and Recommendation.

Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation. If objections are filed, the parties should use the following case number:  CV 07-083-TUC-RCC.  A party may respond to another party's objections within ten days after being served with a copy thereof.  *See* Fed.R.Civ.P. 72(b).

If objections are not timely filed, then the parties' right to *de novo* review by the District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114, 1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

DATED this 10th day of March, 2008.

_____
Héctor C. Estrada
United States Magistrate Judge